**Lynn M. CADENA, Plaintiff,**

v.

**The PACESETTER CORPORATION, Defendant.**

**No. CIV. A. 97–2659–KHV.**

United States District Court, D. Kansas.

Aug. 6, 1998.

Michael S. Ketchmark, Brett A. Davis, Larson & Larson, P.C., Kansas City, MO, for Plaintiff.

Carl A. Gallagher, Gregory P. Goheen, McAnany, Van Cleave & Phillips, P.A., Kansas City, MO, for Defendant.

## *MEMORANDUM AND ORDER*

VRATIL, District Judge.

On December 18, 1997, plaintiff filed suit against her former employer, The Pacesetter Corporation, seeking damages for employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended. Plaintiff alleges that defendant subjected her to a hostile work environment and constructively discharged her from her job as a telemarketer. This matter comes before the Court on defendant's *Motion For Summary Judgment* (Doc. # 42) filed June 15, 1998. Defendant asserts that plaintiff has failed to state a prima facie case of hostile work environment sexual harassment or constructive discharge. For reasons stated more fully below, the Court finds that defendant's motion should be overruled in part and sustained in part.

### Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."

*Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson* at 251–52, 106 S.Ct. 2505.

### Factual Background

The following material facts are undisputed, or where disputed, viewed in the light most favorable to plaintiff.

The Pacesetter Corporation is a large corporation that manufactures, sells, and installs windows, siding, flooring and cabinets for existing homes. Pacesetter employs telemarketers to develop sales leads, and it employed plaintiff as a telemarketer in July of 1996, at its facility in Lenexa, Kansas. Except for a three-week period from October 2 to October 26, 1996,[1] Charles Bauersfeld was plaintiff's supervisor. Between October 26, 1996 and February 20, 1997, when plaintiff resigned, Bauersfeld shared supervisory authority over plaintiff. After January 2, 1997, three people—Bauersfeld, Dave Hawley, and Ann Humphrey—shared that supervisory authority. At all relevant times, Tim Whittinghill was Vice President/General Manager, and was responsible for hiring and firing in the Lenexa facility.

In November, 1996, Bauersfeld told plaintiff that he was glad she had gone out with him and other Pacesetter employees, because he had a "wet dream" about her that night. Bauersfeld told plaintiff that he "had to pinch himself to make sure it wasn't real." Plaintiff's Appendix Exhibit B, Cadena Deposition at 23, 24. Plaintiff immediately walked out of Bauersfeld's office and reported the incident to Hawley, another supervisor. Hawley shrugged his shoulders and told her that that's how Charlie was. From the record, it does not appear that Hawley reported the complaint to Whittinghill or any other supervisor or manager.

After plaintiff complained to Hawley, Bauersfeld continued to engage in similar conduct that was offensive to plaintiff. Bauersfeld asked plaintiff to go out with him on Friday nights so he could have wet dreams about her. This occurred on Fridays from November 1996 until plaintiff's employment ended. On several occasions in early 1997, when plaintiff arrived late for work and asked Bauersfeld where he wanted plaintiff to report for assignment, he said " preferably on my desk." Plaintiff's Appendix Exhibit B, 33–34. One day, after making the desk comment, Bauersfeld also told plaintiff not to wear her hair that way because it turned him on too much.

---

**1.** Dave Hawley supervised plaintiff during this period.

On another occasion, plaintiff told Bauersfeld that he was a "softy," despite his tough demeanor in motivational meetings. Bauersfeld responded by looking down at his groin and saying "I hope I'm not too much of a softy down there." Plaintiff's Appendix, Exhibit B, 36. Another time, Bauersfeld asked plaintiff if a co-worker was grumpy because she hadn't gotten laid the previous evening; plaintiff responded that it wasn't any of her business.

Finally, on February 13, 1997, Bauersfeld asked Rick Payne, a male co-worker who was sitting next to plaintiff, if it would motivate him "if I have [plaintiff] flash you her breasts ... I know that sure as hell would motivate me." Plaintiff's Exhibit B, 58:17–21. Bauersfeld said he was just kidding, and then whispered in plaintiff's ear "you know what they say, though, the truth is always said in jest." Id. at 59:20–60:5. Plaintiff was upset but finished her call and then began to cry and ran to the bathroom. She tried to calm down but continued to cry and went to Bauersfeld's office and told him that she couldn't take any more. He apologized that he got her upset, but he changed the subject.

Plaintiff came to the office the next day, although she was not scheduled to work, and complained to Hawley about the flashing incident and the other incidents outlined above. Hawley told her that it had been a stressful day for Bauersfeld and that "he gets crazy when he's stressed out." Plaintiff's Exhibit B at 68:4–12. Plaintiff then worked on Monday and Tuesday, February 17 and 18. Bauersfeld would not speak to her on those days. On February 20, plaintiff brought a letter of resignation to the office and put it on Hawley's desk. Hawley testified that he did not receive the letter.

When plaintiff reported the incidents to Hawley on February 14, Whittinghill was in Florida on vacation. A few days later, Hawley traveled to Florida on vacation and told Whittinghill about plaintiff's complaint concerning the "flashing" comment. Hawley did not tell Whittinghill about plaintiff's other complaints. When Whittinghill returned from Florida in late February, he contacted both Bauersfeld and plaintiff regarding the "flashing" comment. Bauersfeld admitted that he had made the comment and told Whittinghill that he had apologized to plaintiff. Whittinghill also learned that another employee had complained about Bauersfeld's actions and on March 6, 1997, he gave Bauersfeld a written reprimand.[2]

In late February and early March, Whittinghill called plaintiff twice to discuss a possible return to work. Whittinghill offered plaintiff a pay raise if she would return to work and drop the sexual harassment complaint. During these conversations Whittinghill told plaintiff that she was attractive and that was probably why Bauersfeld said the things he said. He told her she should view Bauersfeld's attraction to her as a compliment. Plaintiff's Appendix Exhibit B, 84–87. After her first conversation with Whittinghill, plaintiff sent him a letter dated March 5 in which she stated that she could not come back to work "as long as Charlie is still there" because he was "constantly hitting on me and making sexual remarks" and "[t]he final straw came when he asked to see my breasts." Plaintiff's Appendix Exhibit L.

In response, Whittinghill called plaintiff. He told her the offer of reemployment still stood, that he had given Bauersfeld a written warning, and he promised that Bauersfeld would be fired if he repeated his offensive actions. Plaintiff then called Hawley to determine whether he thought that the problems with Bauersfeld would really stop. Hawley told plaintiff that the company would not fire Bauersfeld because he brought too much money into the office. Hawley told her to get an attorney and not to return to work because things would not change and it would be "hell" for her if she came back. Hawley told plaintiff that Bauersfeld had asked him to lie about her complaints and that he thought Bauersfeld had destroyed her resignation letter. Plaintiff did not return to work.

2. The reprimand, which was captioned "Final Written Warning," stated that the reason for corrective action was "reports of hostile working conditions, vulgarity, sexual harassment, and less than professional conduct in dealing with dep't or other profit center employees." Defendant's exhibit 1–E.

Defendant's Employee Handbook stated that Pacesetter had a policy against sexual harassment:

The term "sexual harassment" includes but is not limited to unwelcome sexual advances, requests for sexual favors, or communications or physical contact of a sexual nature. Unlawful sexual harassment occurs when submission to such conduct is directly or indirectly made a requirement of the individual's employment or used as a basis for any employment decision or when such conduct unreasonably interferes with the individual's work performance or creates an intimidating, hostile or offensive work environment. Examples of offensive behavior may include "dirty" or off color jokes or remarks; sexist comments about person's clothing or body; unnecessary touching; the use of greetings or titles offensive to the employee; the retention of sexual literature, cartoons or calendars on company premises; and other similar conduct or communications.

Employees who believe they have been subjected to unlawful harassment are encouraged to bring their complaint to the attention of their immediate supervisor. If the employee feels that it is his or her supervisor that caused or knowingly condoned the harassment, then the employee should go to that supervisor's supervisor. In addition, complaints of harassment may be taken directly to Mr. Ivan Gerard, Vice President of Human Resources or Mrs. Cricket Thompson, Director of Human Resources or in the case of sexual harassment, to another member of management of the same sex as the employee making the complaint.

Supervisory personnel are instructed to use all reasonable means to become aware of whether employees are being subjected to unlawful harassment. Any supervisor who knows or should know that any Pacesetter employee is being subjected to unlawful harassment is instructed to take immediate corrective action *and* to immediately report any incident to the Vice President of Human Resources or the Director of Human Resources in Omaha. Appropriate disciplinary measures will be taken against employees who cause, engage in, encourage, or otherwise permit unlawful harassment as well as supervisory persons who fail to take corrective action.

Any time a harassment complaint has been made as provided above, the supervisor or some other individual appointed by the company will take immediate action to investigate the complaint and will recommend to management appropriate disciplinary action. The complaining employee will receive an explanation of the results of the company's investigation regarding the complaint. Should the investigation show a violation of this policy occurred, the complaining employee will be given notification as to what corrective and/or disciplinary action, if any, was or will be taken.

Under no circumstances will any person who in good faith makes a complaint of harassment, or assists in its investigation, be subject to any form of retribution or retaliation, directly or indirectly. Any person who makes or participates in such retribution or retaliation, directly or indirectly, will be subject to severe corrective action.

Plaintiff's Appendix Exhibit C.

Pacesetter sent occasional memos to general managers concerning its policy against sexual harassment. The opening paragraph of one such memo, from Jim Miller, Corporate Counsel, on December 26, 1991 stated as follows:

The highly publicized confirmation hearings for Clarence Thomas did much to place before the public the emotionally charged issues of sexual harassment. Although the charge did not ultimately block the judge's confirmation, the hearings created an "emergency" atmosphere on capital hill. The most strident of the feminists actually managed to grasp victory out of the jaws of defeat by playing upon this crisis mentality to bully Congress and President Bush into enacting the Civil Rights Act of 1991. Among other things this new law will now permit victims of sexual harassment to recover up to $300,-000 in punitive damages from their employers. The price tag for any type of

sexual harassment has now been increased significantly.

Defendant's Exhibit. 1. In and before 1994, Pacesetter distributed six memos related to sexual harassment. On February 5, 1997, it distributed a memo that specifically addressed office romances.

Plaintiff was aware that the Employment Handbook contained a sexual harassment policy. Hawley testified that plaintiff complied with the policy when she reported the "flashing" incident to him on February 14, 1997, because he was one of her supervisors at the time. The parties· dispute whether plaintiff reported the "wet dream" incident to Hawley in November, 1996, and whether Hawley was even plaintiff's supervisor at that point. In any event, Hawley did not report plaintiff's complaint to anyone in November of 1996, and he did not think that he had a responsibility to report sexual harassment complaints to the human resources department under any circumstance. Hawley did report the "flashing" incident to Whittinghill,[3] but he did not report it to anyone in human resources.

## ANALYSIS

### I. Hostile Work Environment Claim

Pacesetter argues that plaintiff has failed to state a prima facie case of hostile work environment sexual harassment. After carefully considering plaintiff's evidence concerning the alleged conduct, the totality of the circumstances, and the applicable standard for analyzing a hostile work environment claim, the Court concludes that plaintiff has made a sufficient showing to withstand summary judgment on this claim.

### A. Severe or Pervasive Sexual Harassment

■ Title VII prohibits an employer from discriminating against an employee on the basis of sex with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). This prohibition extends to hostile work environment sexual harassment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir.1998). Hostile work environment harassment occurs when unwelcome sexual conduct "unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to 'to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* at 67, 106 S.Ct. 2399 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).

Viewed in the light most favorable to plaintiff, the record evidence is that plaintiff's supervisor engaged in a running stream of sexually explicit commentary which created a hostile work environment under Title VII. More specifically, Bauersfeld (1) on a weekly

---

**3.** After he returned from his vacation, Whittinghill spoke with plaintiff and Bauersfeld, but did not further investigate the complaint. He did not speak with other employees who might have knowledge of the complaint, such as Mary Sorrells. Sorrells later testified that Bauersfeld was sexually harassing plaintiff on a "regular basis." Plaintiff's Exhibit E. at 13–15; 18–19. Nor did Whittinghill contact Rick Payne, the employee who was present during the "flashing" incident. Payne testified that he observed the incident and saw plaintiff crying after it occurred.

Humphrey, one of plaintiff's supervisors, stated that she did not believe it would violate Pacesetter's harassment policy if a supervisor exposes his penis or "forcefully gra[b]s the breasts of a subordinate employee," so long as he apologizes afterward. Plaintiff's Exhibit. I, at 14–15. Humphrey stated that she would not be obligated to report such an incident to Pacesetter's human resources department. Although Humphrey was aware of the "flashing incident," she did not report it.

At the direction of Pacesetter's general counsel (who said there was a potential lawsuit), Cricket Thompson investigated the "flashing incident" for the human resources department. Pacesetter's general counsel told Thompson to "find out what was going on in the Kansas City Area," Plaintiff's Addendum Ex. K 9–12, but he apparently did not tell Thompson who made the complaint or who it was against. Thompson did not learn the identity of the complainant until a few weeks before her deposition in this case. Thompson does not recall who she talked to in the course of her investigation, but she did not contact plaintiff, Bauersfeld, Hawley, Humphrey, or Whittinghill. She had no input into any decision whether Bauersfeld would be disciplined.

basis, for two to three months, entreated plaintiff to go out with him on Fridays "so he could have wet dreams about her"; (2) on several occasions in early 1997, told plaintiff that her work station was "preferably on my desk"; (3) told plaintiff that she should not wear her hair a certain way because it "turned him on" too much; (4) lamented to plaintiff that he hoped he was "not too much of a softy" in his groin area ("down there"); (5) queried plaintiff whether a co-worker was grumpy because she "hadn't gotten [ ] laid last night"; and (6) asked plaintiff's co-worker whether he would be motivated if Bauersfeld had plaintiff "flash ... her breasts," confessed that that "sure as hell" would motivate him, faked an apology to plaintiff, then immediately retracted it because (in his words) "the truth is always said in jest."

■ In determining whether Bauersfeld's conduct was sufficiently severe or pervasive to constitute actionable sexual harassment, the Court considers the totality of the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, —— U.S. ——, ——, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting *Harris v. Forklift Systems Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The court also considers the context in which the conduct occurred. *Smith v. Norwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir.1997). These factors are evaluated from both an objective and a subjective perspective. *Id.* (conduct must be severe or pervasive enough to create both " 'an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile'—and an environment the victim-employee subjectively perceives as abusive or hostile.") (quoting *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367).

The test whether a work environment is hostile or abusive is disjunctive, "requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of Plaintiff's employment." *See Norwest Financial*, 129 F.3d at 1413. Defendant asserts that plaintiff cannot show that the harassing conduct was pervasive, because in November of 1996, plaintiff only told Hawley about one "wet dream" comment. Defendant argues that this isolated complaint was not enough to put it on notice of a hostile work environment. This argument, however, misses the mark. Whether the employer had notice of the misconduct is relevant to the employer's liability, but it does not necessarily bear on the issue whether the conduct was pervasive or severe.[4]

■ Plaintiff has presented facts which are sufficient to support a finding that the harassment was subjectively pervasive and severe. Plaintiff presented evidence that she took offense at Bauersfeld's "constant hitting on me and making sexual remarks." She recounted that he often repeated two remarks in particular—the "wet dream" comment and the "on my desk" comment. She complained to her co-worker, Mary Sorrells, that Bauersfeld made these comments on a regular basis. Plaintiff testified that it affected her ability to work, and a co-worker testified that on at least one occasion the comments reduced plaintiff to tears. This evidence is sufficient to create a jury question whether the conduct was subjectively pervasive and severe.

The Court thus turns to the question whether under the totality of the circumstances, a reasonable person would find the conduct was pervasive enough to create a hostile or abusive environment.[5] Defendant contends that in order to prevail, plaintiff

---

4. Furthermore, plaintiff has presented evidence that she reported all of Bauersfeld's misconduct to Hawley in February of 1997, and she asserts that Pacesetter still did not take immediate steps to address the harassment. In any event, at this stage in the analysis the question is whether the totality of the harassing conduct was pervasive or severe enough to be actionable.

5. In response to defendant's summary judgment motion plaintiff focuses almost exclusively on the pervasiveness of the harassment. We do not read her response, however, as waiving the claim that the harassment was severe.

must show a "steady barrage of opprobrious" sexual comments. *See Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (three racial remarks in eight years not pervasive conduct). "[I]solated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Norwest Financial,* 129 F.3d at 1414; *see also Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1175 (10th Cir.1996)(one isolated comment and use of term "girlie" did not constitute pervasive harassment). In this case, however, plaintiff has pointed to a number of sexually suggestive and or sexually demeaning remarks, at least two of which were repeated on numerous occasions over a period which spanned only two to three months.

Although the Court must look at all of the circumstances, and each case in this area is factually unique, recent cases in the Tenth Circuit provide a useful comparison. For example, in *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355 (10th Cir.1997), plaintiff alleged five separate incidents of sexually-oriented, offensive incidents involving a co-worker/supervisor: (1) a statement to plaintiff that "you really need to undo that top button"; (2) a statement correcting another person's reference to "girls" by saying that "you can't call them girls[,][y]ou have to call them ladies"; (3) a comment, regarding women and pre-menstrual syndrome, that "you know how they are at that time of the month"; ( 4) a comment after looking down plaintiff's wedding dress, that "you got to get it when you can"; and (5) in a conversation about "neck chains," a comment that "neck chains" sounded "kind of kinky." *Id.* at 1366. The *Sprague* panel held that this conduct was "unpleasant and boorish" but not pervasive or severe enough to create an actionable hostile work environment. The Tenth Circuit noted that the most serious incident was the one at plaintiff's wedding, which occurred outside the workplace. Further, the conduct "occurred sporadically" over sixteen months. *Sprague,* 129 F.3d at 1366.

6. In the alternative, the facts viewed in a light most favorable to plaintiff also support a finding that the harassment was severe. In addition to the factors already addressed above, the remarks were made by plaintiff's direct supervisor, a factor that the Tenth Circuit has indicated is particularly relevant to the severity of the harassment.

In contrast, Bauersfeld's commentary was much more objectionable. In particular, the "wet dream" comments, the "on my desk" comments, and the "breast" discussion were independently humiliating and degrading. The comments occurred much more frequently and over a much shorter time than in *Sprague.* The Court finds that plaintiff presented facts from which a jury might reasonably find that the harassment was pervasive.[6]

## B. Employer Liability

Until the recent Supreme Court decisions in *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), an employer in the Tenth Circuit could be held liable under Title VII for hostile work environment sexual harassment committed by a supervisor under any of the following conditions:

(1) The supervisor committed the harassment while acting in the scope of his employment. See Restatement (Second) of Agency § 219(1). ( ... [T]his will rarely be a basis for employer liability.)

(2) The employer knew about, or should have known about, the harassment and failed to respond in a reasonable manner. See Restatement (Second) of Agency § 219(2)(b).

(3) If the employer manifested in the supervisor the authority to act on its behalf, such manifestation resulted in harm to the plaintiff, and the plaintiff acted or relied on the apparent authority in some way. See Restatement (Second) of Agency § 219(2)(d), clause 1.

(4) If the employer delegated the authority to the supervisor to control the plaintiff's work environment and the

Although in this case most of the comments were not made in front of co-workers, *cf. Norwest Financial,* 129 F.3d at 1413 (public setting only increased the humiliation, and therefore severity of conduct), the suggestion that things would go better for plaintiff if she was in Bauersfeld's circle also increased the severity of his remarks.

supervisor abused that delegated authority by using that authority to aid or facilitate his perpetration of the harassment. See Restatement (Second) of Agency § 219(2)(d), clause 2. *Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1446 (10th Cir.1997), cert. granted and judgment vacated, —— U.S. ——, 118 S.Ct. 2364, 141 L.Ed.2d 732 (1998) (remanding to Tenth Circuit for further consideration in light of *Faragher v. City of Boca Raton*, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Plaintiff's claim appears to incorporate all of these theories. To the extent that plaintiff alleges that Bauersfeld was acting within the scope of his employment, plaintiff has failed to make the showing such a claim requires. See *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir.1987) (this theory requires plaintiff show that sexual harassment was within his job description, a showing which is almost never possible).

We thus turn to plaintiff's other theories of liability, including negligence and the two theories of vicarious liability. Shortly after defendant filed its motion for summary judgment, on June 26, 1998, the Supreme Court in *Faragher* and *Burlington Industries* altered the test for vicarious liability and apparently replaced the third and fourth theories set out in *Harrison.* In *Faragher*, the Supreme Court held as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.

118 S.Ct. at 2292–93. Thus in the arena of vicarious liability, the Supreme Court placed on defendant the burden to plead and prove as an affirmative defense that it had an effective harassment policy and that plaintiff failed to avail herself of the policy. Lacking the benefit of the Supreme Court's view on this matter when it filed it's summary judgment motion, Pacesetter framed these issues as ones which defined plaintiff's prima facie case. It further raised this new affirmative defense in the reply brief in support of its summary judgment motion. See *Defendant Pacesetter's Reply Memorandum In Support Of Summary Judgment* (Doc. # 69) filed July 31, 1998. But our reading of *Faragher* and *Burlington Industries* suggests that the negligence theory continues to be viable. See —— U.S. ——, ——, 118 S.Ct. 2257, 2267, 141 L.Ed.2d 633 ("Negligence sets a minimum standard for employer liability under Title VII, but [plaintiff] seeks to invoke the more stringent standard of vicarious liability."). The Court will thus analyze plaintiff's negligence claim to determine if it survives summary judgment.

### 1. Negligence

 Plaintiff asserts that defendant is liable for negligence or recklessness in failing to respond to hostile work environment sexual harassment by Bauersfeld. "Under this theory of employer liability, the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Adler*, 144 F.3d at 672 (further quotation and citation omitted). The employer negligence is "failing to remedy or prevent a hostile or offensive work environment of which management-level employees know, or in the exercise of reasonable care should have known." *Id.* (further quotations and citations omitted). The negligence theory requires the Court to make two inquiries: "first, into the employer's actual or constructive knowledge of the harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." *Id.* at 673.

#### a. *Knowledge*

 Actual knowledge is demonstrated where the plaintiff has reported harassment to management-level employees, including supervisors. *Adler*, 144 F.3d at 673. Constructive knowledge can be inferred from evidence of pervasive sexual harassment. *Id.*; see, e.g., *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1346 (10th Cir.1990).

In this case plaintiff has presented evidence that she reported the first "wet dream" comment to Hawley in November of 1996. Hawley was a supervisor and thus a management level employee for purposes of our analysis. *See Adler*, 144 F.3d at 674; *see also* 29 C.F.R. § 1604.11(d) [7] This report put defendant on actual notice that Bauersfeld made the "wet dream" comment to plaintiff.[8] Plaintiff also presented evidence that she reported the "flashing" incident and the other incidents to Hawley on February 14, 1997. *See* Plaintiff's Appendix Exhibit B, 65; 67–68. For purposes of our analysis, defendant had actual knowledge of these incidents at that time.

b. *Employer response*

"[T]he touchstone for the evaluation of an employer's response under *Meritor* and *Hicks* is reasonableness." *Adler*, 144 F.3d at 675–76. The test is "whether the remedial and preventative action was 'reasonably calculated to end the harassment.'" *Id.* (citing *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.1991)). "In cases where effectiveness is not readily evidenced by a stoppage, we consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment." 144 F.3d at 676 (further citations omitted). Responses that have been found reasonable "have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination." *Id.*

Plaintiff produced evidence that defendant utterly failed to respond to the first incident of harassment which she reported in November of 1996. Although defendant has countered with evidence that plaintiff did not report the first incident, this is a controverted factual question. Assuming that plaintiff complained about the "wet dream" comment, defendant should have responded in some manner. Defendant's response to plaintiff's first complaint was not adequate; it was no response at all. *Cf. Jeffries v. State of Kansas*, 147 F.3d 1220 (10th Cir.1998) (supervisor took "action reasonably calculated" to prevent further hugs and conduct never recurred).

Plaintiff asserts that defendant also failed to reasonably respond to her second complaint. That complaint included many incidents, and clearly plaintiff could have complained about some of them earlier. On the other hand, defendant did not respond to plaintiff's first complaint, and plaintiff may have had objectively reasonable grounds to delay any further complaints. Plaintiff's evidence is that she complained to Hawley one day after the "flashing" comment, and told him about all of the other misconduct enumerated above. Hawley's response was that Bauersfeld was stressed out and "that's [Bauersfeld] for you." Pacesetter took no action immediately after plaintiff's complaint. Plaintiff worked for two days after her second complaint to Hawley, and Bauersfeld would not speak to her on either day. Plaintiff alleges it was impossible for her to do her work in that circumstance. Defendant took no action during those few days to ensure that the work environment was tolerable, and plaintiff resigned on February 20, 1997.

Whittinghill's investigation of plaintiff's second complaint, which occurred approximately two weeks after plaintiff's complaint to Hawley on February 14, was arguably

---

7. 29 C.F.R. § 1604.11(d) provides that "[w]ith respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."

8. Although not determinative, plaintiff also presented evidence that in response to her complaint in November of 1996, Hawley said something to the effect of "that's the way [Bauersfeld] is." Similarly in February of 1997, when plaintiff made her second complaint, Hawley stated "that's Bauersfeld for you." Such comments strongly suggest that defendant had actual knowledge that Bauersfeld was engaging in harassment well before any complaints by plaintiff.

untimely. *Cf. Hirschfeld v. New Mexico Corrections Dep't.*, 916 F.2d 572, 577 (10th Cir.1990) (warden conducted investigation the day after the complaint and placed alleged harasser on administrative leave that evening; court found this constituted "prompt remedial action."). Defendant ultimately did give Bauersfeld a "final written warning" on March 6, but the evidence would support a reasonable inference that Pacesetter did not respond to plaintiff's complaints in a timely manner.

The next question is whether defendant's response to plaintiff's second complaint was reasonably calculated to end the harassment. Defendant did not act unreasonably in giving Bauersfeld a final written warning. The question is whether that response was reasonably calculated, however, to end the harassment. Hawley told plaintiff that Pacesetter would never fire Bauersfeld and that her life would be hell if she returned to work. Such evidence suggests that defendant should have implemented other corrective measures, including reassignment, so that Bauersfeld had no contact with plaintiff. Further, while Whittinghill told plaintiff that if she resumed work she would receive a raise and not be subject to harassment, plaintiff presented evidence that the offer was conditioned upon her not filing an E.E.O.C. complaint.

Although the Court finds this a close question, under all of the circumstances plaintiff has offered evidence that defendant did not take prompt action reasonably calculated to stop the harassment. Thus the Court denies defendant's summary judgment motion on plaintiff's claim of employment discrimination on the basis of hostile work environment.

## 2. Vicarious Liability

■ The Court will briefly address whether plaintiff also escapes summary judgment on the theory, newly articulated in *Faragher* and *Burlington Industries*, that defendant is subject to vicarious liability because a supervisor with immediate authority over plaintiff created an actionable hostile environment. In *Burlington Industries*, the Supreme Court stated as follows:

In order to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Faragher v. Boca Raton*, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), also decided today. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

118 S.Ct. at 2270.

■ The Court has already determined that plaintiff has set forth facts that would support a finding of an actionable hostile

work environment created by Bauersfeld, a supervisor with authority over plaintiff. Thus defendant is subject to vicarious liability for harm caused to plaintiff unless it pleads and proves by a preponderance of the evidence that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *id.*, and that plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities" provided by defendant or to otherwise avoid harm. *Id.*

Defendant properly raised the defense in this case, asserting that its sexual harassment policy and its responses to plaintiff's complaints met the first element of the defense. But as reflected in the Court's analysis of the negligence claim, plaintiff has raised a disputed issue of material fact whether defendant took reasonable care to prevent and correct the sexually harassing behavior in this case. Defendant has not shown that it is entitled to summary judgment on the affirmative defense.

## II. Constructive Discharge

 Plaintiff also claims that Pacesetter, by allowing Bauersfeld to engage in the foregoing misconduct, constructively discharged her from her employment. In order set out a constructive discharge claim, plaintiff must allege facts sufficient to demonstrate that an objectively reasonable person would have viewed her working conditions as intolerable. *Sprague*, 129 F.3d at 1367. "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Jeffries*, 147 F.3d at 1232–33. "Essentially, a plaintiff must show that she had no other choice but to quit." *Yearous v. Niobrara Co. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997).

Although plaintiff has set out a prima facie case of hostile work environment sufficient to avoid summary judgment, the facts, viewed in a light most favorable to plaintiff, are not sufficient to meet the higher standard for constructive discharge. Although on this record it appears that Bauersfeld created a hostile environment, plaintiff concedes that she had no problems with other employees

and that Bauersfeld made no comments after her second complaint. Although the Court agrees that the record presents a question of fact whether defendant acted in a prompt manner to address her complaints, it also finds that a reasonable person in plaintiff's situation would have stayed on until the investigation had run its course, or would have returned to work to determine whether defendant's corrective measures had resolved the problem. Defendant's motion for summary judgment on plaintiff's claim of constructive discharge is sustained.

**IT IS THEREFORE ORDERED THAT** *Defendant's Motion For Summary Judgment* (Doc. # 42) filed June 15, 1998 be and hereby is **OVERRULED** as to plaintiff's claim of a hostile work environment and **SUSTAINED** as to plaintiff's claim of constructive discharge.