**Diana RAHN, Plaintiff,**

v.

**JUNCTION CITY FOUNDRY, INC., Defendant.**

**No. CIV. A. 00–2128–KHV.**

United States District Court, D. Kansas.

Feb. 7, 2001.

---

Walter P. Robertson, Junction City, KS, Martin M. Meyers, Stephen C. Thornberry, The Meyers Law Firm, LC, Kansas City, MO, for plaintiff.

Joseph M. Backer, Boggs, Backer & Bates, LLC, Kansas City, MO, William S. Robbins, Jr., Watkins, Boulware, Lucas, Miner, Murphy & Taylor, LLP, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff, a former employee of Junction City Foundry, Inc., filed suit alleging that defendant subjected her to a sexually hostile work environment and constructively discharged her in retaliation for complaining about the discriminatory conduct, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended. The matter is before the Court on Defendant's Motion For Summary Judgment (Doc. # 61) filed December 8, 2000, and plaintiff's Motion To Supplement The Record On Summary Judgment (Doc. # 66) filed January 31, 2001. For the reasons set forth below, the Court finds that defendant's motion should be overruled, and that plaintiff's motion should be sustained.

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); accord *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

In considering a summary judgment motion the Court must view the evidence in the light most favorable to the nonmoving party. *Tom v. First Am. Credit Union,* 151 F.3d 1289, 1291 (10th Cir.1998). Summary judgment may be granted, however, if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. Thus, " '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." *Thomas v. IBM,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### Facts

The following facts are uncontroverted or, where controverted, set forth in the light most favorable to plaintiff. Defendant hired plaintiff on September 9, 1997. She initially worked in the core room with Terry Curtis as her supervisor. Curtis reported to plant manager Joe Teeter, who reported to Steve Didion, defendant's president. Sandra Wheeler, defendant's personnel manager, reported directly to Didion.

In February 1998, defendant transferred plaintiff to the molding lines, and ultimately assigned her the job of muller operator. In this position, plaintiff began to interact with David Knox, Dennis Dezotell and other grinders. Terry Curtis continued to serve as her supervisor.

Sometimes plaintiff wore to work a sexually suggestive shirt with a "Big Johnson" logo on it. At the beginning of her employment with defendant, plaintiff brought cartoons and jokes to work and distributed them. Some of these were sexually suggestive and included words such as "shit," "damn," "hell" and "fuck." At the time, she worked in the core room and not with the individuals who allegedly engaged in harassment later in her employment. The record contains no evidence that Knox, Dezotell, or anyone in grinding saw the jokes. While she worked at the foundry, plaintiff laughed when someone told a "dirty joke" if she thought it was funny.

Beginning in March or April 1998, Dezotell and Knox made numerous sexually inappropriate comments to plaintiff. Dezotell told plaintiff that he knew how she could make some money, and took her to Knox, who asked her if he could buy her underwear for twenty dollars. This comment shocked and embarrassed plaintiff. She reported it to Curtis within a day or two and also reported it to Wheeler.

Shortly afterwards, Knox offered plaintiff fifty dollars to watch him masturbate. Plaintiff was embarrassed and returned to her work station. Plaintiff told Curtis about this incident. Curtis told plaintiff that he thought Knox was "sick." Knox told co-workers he had a blow-up doll at home named "Diana," which was plaintiff's first name. Knox offered plaintiff cash to wash his windows naked or to lie in his bed naked. One day when plaintiff was absent from work, Knox told co-workers that he had tied her up in his basement and that he had been having sex with her. Plaintiff talked to Curtis about this comment be-

cause it "gave her the creeps." Curtis heard about this comment and did nothing about it.

In April 1998, Dezotell asked plaintiff to "show me your tits" and said that he would show her his penis. Plaintiff complained to Curtis about this comment shortly afterwards. Dezotell also repeatedly asked plaintiff to go out with him or meet him at bars.

Knox and others in the grinding department accused plaintiff of having sexual relations with Gary Joseph. Knox made lewd comments of a sexual nature regarding plaintiff to Gary Joseph, such as asking Joseph if he could smell his penis because he "knew" that Joseph had had sexual relations with plaintiff. Employees spread rumors that plaintiff was having an affair with Joseph, and that she was pregnant with his child.

Knox asked plaintiff to marry him, and gave her as rings metal bands which he had made in the Foundry. Knox asked plaintiff if she shaved her pubic hair. Knox slapped plaintiff on the buttocks as she walked past him. On more than one occasion, Knox attempted to expose his penis on the workroom floor. Once, Knox unzipped his pants, pantomimed having sex with a large metal casting, and waved at plaintiff to get her attention.[1]

Co-workers twice gave plaintiff cast iron penises. She found this offensive. Mike Havens put a cast iron penis on plaintiff's fork lift, and she took it back to her work station at the "muller." Plaintiff showed it to Curtis, who said that he would take care of it. Plaintiff later told personnel manager Sandra Wheeler about it. In May or June of 1998, other workers called plaintiff to a table outside the plant, where she found a cast-iron penis wrapped up in some paper towels on a table. She left it sitting there. Little Joe, a co-worker, then brought the penis to plaintiff's work station.[2] He told her that Knox had said that that was what he [Knox] looked like and that he had it made so that she would know what he looked like. Plaintiff placed the penis on a table near her work station and ignored it. When Pat Oquist, a co-worker, approached plaintiff's work station, plaintiff showed her the cast iron penis. Oquist asked how she could obtain one, and plaintiff told her to ask the co-employees who she believed were making them, including Little Joe. Plaintiff did not tell Oquist that she had reported anyone for sexual harassment arising out of the cast iron penises.

On December 11, 1998, plaintiff again complained to Curtis about inappropriate sexual comments. He took her to speak with Fred Hirsch, the new personnel manager. Plaintiff told Hirsch about many of the comments that Knox had made over the previous months, including the underwear comment and the comment about him having plaintiff tied up in the basement. Curtis sat in on the meeting and was embarrassed by some of the comments. Plaintiff also told Hirsch that Joseph had heard some of the comments.

Later, while investigating plaintiff's complaints, Hirsch asked Knox if he had made a statement about offering plaintiff money in exchange for anything she would do. Knox indicated that he had said something vaguely similar. During this initial investigation, Hirsch asked Knox about only one of the comments that plaintiff had

---

1. According to Knox, grinders occasionally pretended that they were sticking their penises in castings.

2. Little Joe spread rumors about plaintiff and spread sexual comments about plaintiff that Knox had made. She did not feel threatened by him, however, and did not think that he was hostile towards her.

complained of, and Hirsch did not speak to Joseph or any one else at that time.

On January 7, 1999, plaintiff complained to Hirsch because she did not believe that he had investigated her complaint. She told Hirsch that Knox had another employee give her a small pigeon with a broken wing, and that she took it as a threat. Hirsch told plaintiff that he had spoken to Knox and Dezotell and that he did not know who to believe. Plaintiff asked Hirsch and Teeter (the plant manager) to move Knox to another grinding stall where she would not have contact with him. They refused, stating that Knox would be uncomfortable in another stall because he had worked in that location for a long time.

On January 8, 1999, Hirsch had all of defendant's employees read and sign the pre-existing sexual harassment policy.[3] On January 14, 1999, plaintiff's attorney wrote Didion, defendant's president, alleging that defendant had subjected plaintiff to sexual harassment and retaliation and that it was continuing. This was her first complaint directly to Mr. Didion, and as far as she knew, it was the first time he had heard anything about her complaints of sexual harassment.

Sometime in January 1999, plaintiff heard that Knox had said if anything happened to his job he would "kill the bitch." On January 21, 1999, plaintiff went to get a drink of water by the stairs leading to the breakroom while Joseph apparently was in the breakroom. Curtis, plaintiff's supervisor, approached plaintiff, yelled at her, poked her in the chest, told her he was tired of all the "bullshit" going on and tired of people complaining about her, and said "you guys are acting like my kids." Rahn Depo. at 175. Curtis told plaintiff that Dezotell had told him that plaintiff was in the breakroom speaking to Joseph when she should have been working. When plaintiff denied this, Curtis called her a liar and "wrote her up" for the incident. Depo 176. Shortly after this incident, plaintiff and Joseph complained to Didion about the hostile work environment and retaliation from Knox, Dezotell and Curtis. Didion took no action himself. He relied on Hirsch and a lawyer whom Hirsch had retained, Craig Altenhofen, to handle the situation. Didion seemed very upset with plaintiff's choice of lawyer.

Plaintiff left work on January 22, 1999 and never returned. She submitted a written resignation on January 28, 1999. When she left the foundry in late January, to plaintiff's knowledge no one had been punished for the harassing behavior.

During the investigation of plaintiff's complaints, Knox admitted asking plaintiff if she shaved her private parts and that he pretended to hump castings, told co-workers that he had a blow-up doll named Diana, and asked plaintiff to marry him. As a result of plaintiff's allegations and defendant's investigation, defendant suspended Knox, the alleged chief perpetrator, for a week without pay. Defendant also moved him to the second shift for two weeks. Knox testified that his supervisor, Dezotell, told him that he thought the discipline was "bogus" and that he was taking the action only "because the lawyer said so." Knox depo p. 61–64. Defendant suspended Dezotell for one week without pay. Defendant also suspended Curtis, who allegedly failed to properly investigate and/or report plaintiff's allegations to his superiors, for three days without pay.

During plaintiff's employment, defendant had a written policy which prohibited discrimination and sexual harassment. Defendant gave plaintiff an employee handbook which contained the policy, and

---

**3.** Knox testified that he signed the policy after he "glanced at it."

she signed a receipt which indicated that she had read the handbook. The policy provided as follows:

Junction City Foundry, Inc., expressly prohibits any form of unlawful employment harassment based on race, color, religion, sex, national origin, age, or handicap. Improper interference with the ability of Junction City Foundry, Inc. employees to perform their expected job duties will not be tolerated. Any unlawful harassment should be reported immediately to the personnel director, or, if in your opinion reporting to the Personnel Director would be improper under the circumstances, it should be reported to the plant manager or Steve J. Didion.

With respect to sexual harassment, Junction City Foundry, Inc., prohibits:

1. Unwelcome sexual advances: requests for sexual factors and all verbal or physical conduct of a sexual or otherwise offensive nature, especially where submission to such conduct is made either explicitly or implicitly a term or condition of employment; submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment; where such conduct has the purpose of affecting or creating an intimidating, hostile, or offensive working environment.

2. Offensive comments, jokes, innuendos or other sexually-oriented statements.

Exhibit E, p. 2.

### Analysis

**A. Sexual Harassment Hostile Work Environment Claim.**

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank, FSB v. Vinson*, the United States Supreme Court held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that: (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. *Brandau v. State of Kansas*, 968 F.Supp. 1416 (D.Kan. 1997).

■ To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, see also *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Court evaluates these factors from both a subjective and an objective viewpoint. *Harris*, 510 U.S. at 21, 114 S.Ct. 367. The Court must consider not only

the effect the discriminatory conduct actually had on the plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position. See *Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir.1998).

Plaintiff is a member of the protected class, and defendant appears to concede that the alleged harassment was based on her sex. Defendant asserts that it is entitled to summary judgment because plaintiff has failed to show that the conduct was unwelcome, that the harassment was sufficiently severe or pervasive to create an abusive working environment, or that liability can properly be imputed to defendant.

**1. Unwelcome Conduct**

■ "In order to constitute harassment the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1108 (8th Cir.1998). The question is whether under the totality of the circumstances plaintiff indicated by her conduct that the alleged harassment was unwelcome. *Meritor*, 477 U.S. at 69, 106 S.Ct. 2399; see *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir.1996) (context is relevant, and may include such things as plaintiff's sexually provocative speech).

■ Defendant asserts that the conduct in question was not unwelcome because plaintiff wore a sexually suggestive shirt, brought to work a collection of "dirty jokes," was not offended by the cast iron penis that Little Joe gave her, and laughed at dirty jokes on several occasions. The Court disagrees. "Use of foul language or sexual innuendo in a consensual setting does not waive [plaintiff's ] legal protections against unwelcome harassment." *Burns v. McGregor Elec. Indus., Inc.*, 989

F.2d 959, 963 (8th Cir.1993) (further quotations omitted); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir.1987). That fact that plaintiff laughed at dirty jokes does not establish as a matter of law that the harassers' conduct (summarized below in the Court's discussion of pervasiveness) was welcome. See *Dobrich v. General Dynamics Corp.*, 106 F.Supp.2d 386, 391 (D.Conn.2000) (though plaintiff was "no shrinking violet" and sometimes used foul language at job, she did not waive protections against unwelcome sexual harassment). The fact that plaintiff wore a shirt labeled "Big Johnson" may bear on the inquiry, but does not require a conclusion that she invited suggestive comments by Knox and Dezotell. Further, the fact that she complained to her supervisor and personal director indicates that she did not welcome the conduct.

**2. Hostile or Abusive Environment**

■ Whether a work environment is hostile or abusive is disjunctive, "requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of [p]laintiff's employment." See *Northwest Fin.*, 129 F.3d at 1413. "The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999). "[I]solated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Northwest Fin.*, 129 F.3d at 1414; see also *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir. 1996) (one isolated comment and use of term "girlie" did not constitute pervasive harassment).

Plaintiff's evidence is that co-worker David Knox asked plaintiff if he could buy her underwear; asked her to wash his

windows naked or lie in bed naked in exchange for cash; asked plaintiff if she shaved her pubic hair; told co-workers that plaintiff was tied up in the basement of his home, that he was having sexual relations with her, that he had a blow up doll at home named Diana, and that plaintiff was having sexual relations with a co-worker; unzipped his pants and pretended to have sex with a casting on the workroom floor; and threatened to "kill the bitch" after plaintiff complained to the personnel director. Plaintiff also points to evidence that Dezotell, Knox's supervisor, asked plaintiff to show him her breasts, and that co-workers spread rumors about her sexual activity.[4] Further, co-workers gave cast iron penises to plaintiff on two occasions.

Defendant contends that the conduct of which plaintiff complains did not occur with sufficient frequency that a jury could find it "pervasive." In support, defendant cites only one case, *Bolden v. PRC, Inc.*, 43 F.3d 545, 550 (10th Cir.1994), in which the Tenth Circuit stated that isolated incidents or comments which are not severe in duration or content do not constitute a sexually hostile work environment. In this case, however, plaintiff has pointed to a number of sexually suggestive and sexually demeaning remarks made over a period of eight to nine months. See *Cadena v. Pacesetter Corp.*, 18 F.Supp.2d 1220 (D.Kan.1998) (inappropriate sexual comments by supervisor, two of which were repeated on numerous occasions over a period of a few months, not isolated comments and could support jury finding of pervasive harassment).

Although the Court must consider all of the circumstances, and each case in this area is factually unique, other cases provide a useful comparison. For example, in *Sprague v. Thorn Americas, Inc.*, 129 F.3d

1355 (10th Cir.1997), plaintiff alleged five incidents of sexually-oriented, offensive incidents involving a co-worker/supervisor: (1) a statement to plaintiff that "you really need to undo that top button"; (2) a statement correcting another person's reference to "girls" by saying that "you can't call them girls[,][y]ou have to call them ladies"; (3) a comment, regarding women and pre-menstrual syndrome, that "you know how they are at that time of the month"; (4) a comment after looking down plaintiff's wedding dress, that "you got to get it when you can"; and (5) a comment that "neck chains" sounded "kind of kinky." *Id.* at 1366. The Sprague panel held that this conduct was "unpleasant and boorish" but not pervasive or severe enough to create an actionable hostile work environment. The Tenth Circuit noted that the most serious incident—at plaintiff's wedding—occurred outside the workplace. Further, the conduct "occurred sporadically" over 16 months. *Sprague*, 129 F.3d at 1366. In Cadena, the supervisor's comments were much more objectionable, humiliating and degrading, and included comments concerning his "wet dreams" about plaintiff. The comments in Cadena occurred much more frequently in a shorter time period than in Sprague, and this Court found that a jury might reasonably find that the harassment was pervasive.

In this case, plaintiff has produced evidence that Knox made numerous inappropriate, offensive sexually suggestive comments to and about her within an eight or nine month period. Although he did not physically threaten her face-to-face, he told co-workers that he had her tied in his basement and that he would "kill the bitch" if his job was endangered. Plaintiff did not point to evidence that this conduct interfered with her work performance.

**4.** Plaintiff presented these facts in her response to defendant's motion for summary judgment. Defendant did not file a reply to plaintiff's response.

Taken as a whole, however, the Court finds that all of the facts set forth above are sufficiently pervasive to create an objectively hostile work environment. Cf. *Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257 (10th Cir.1998) (supervisor's conduct over period of several years, including taking plaintiffs to Hooters, requesting that plaintiffs work in his hotel room, asking one plaintiff if she had wet dreams, asking one plaintiff what she was wearing under her dress, stating that a mall roof looked like a woman's breasts, trying to look down one plaintiff's blouse, and needlessly touching plaintiffs on many occasions not severe or pervasive enough to create hostile and abusive environment; vast majority of supervisor's behavior was motivated by poor taste rather than by plaintiffs' gender).

■ Although defendant contends that the behavior was not unwelcome, it does not specifically argue that plaintiff failed to meet the subjective test, *e.g.,* that she presented sufficient facts to support a finding that she herself found the environment hostile. In any event, plaintiff has produced evidence from which a fact finder might reasonably conclude that she subjectively felt that Knox and Dezotell had created a sexually hostile work environment. See *Harris,* 510 U.S at 21, 114 S.Ct. 367 (discriminatorily abusive work environment, even if it does not seriously affect employees' psychological well-being, offends Title VII's broad rule of workplace equality.) The fact that plaintiff complained to her supervisor and personnel directors about Knox and Dezotell evidences that she subjectively perceived the work environment to be sexually abusive. A reasonable jury could find that plaintiff felt that she was subjected to a hostile work environment because of her sex.

### 3. Employer Liability

As for the element of employer liability, defendant states:

Defendant strongly objects to any evidence on the fifth element, any basis for imputing liability to Junction City Foundry. Plaintiff has made no showing whatsoever that there is any cause of action or potential claim against the Foundry arising out of these allegations.

Suggestions In Support of Defendant's Motion For Summary Judgment (Doc. # 62) (filed Dec. 8, 2000) at p. 11. Defendant points to absolutely no case law or facts in support of this argument. Nevertheless, because this is an element on which plaintiff bears the burden of production, the Court will address it.

[13] Under Title VII, an employer may be held liable for hostile work environment sexual harassment committed by one employee against another if the employer negligently or recklessly fails to respond to the harassment. See *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 577 (10th Cir.1990). "This liability attaches when a plaintiff establishes that an employer had actual or constructive notice of the hostile work environment and failed to respond adequately to that notice." *Davis,* 142 F.3d at 1342.

■ Plaintiff produced evidence that she complained to her supervisor, Curtis, shortly after Knox and Dezotell began making inappropriate sexual remarks in March or April 1998. She also points to evidence that even after she complained to personnel director Wheeler about Dezotell and Knox, the harassment continued for months. Plaintiff points to facts which suggest that even after she complained to the new personnel director, Hirsch, in December, the harassment did not end.[5]

**5.** Although plaintiff did not complain to the company president until shortly before she left her job, her complaints to her supervisor and certainly to the personnel managers

Based on all of the evidence which plaintiff has presented, the record reveals a factual question whether defendant had actual or constructive notice of the hostile work environment and whether it failed to respond adequately to that notice. See *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1516 (9th Cir.1989) (employer can be held liable for sexual harassment by one employee against another when general manager of employer had actual knowledge of harassment because victim complained about it to him), *overruled on other grounds, Burrell v. Star Nursery, Inc.*, 170 F.3d 951 (9th Cir.1999); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1016 (8th Cir.1988) (employer liable because construction foreman had actual knowledge of sexual harassment of female employees due to their complaints to him and personally observed some incidents of harassment).

## B. Retaliation Claim

■■■■ In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a causal connection links the protected activity and the adverse employment action. See *Penry*, 155 F.3d at 1263; *Thomas*, 111 F.3d at 1513. Plaintiff can establish the causal connection by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. Once a plaintiff establishes a prima facie case, the burden of production shifts to defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If evidence of a legitimate reason is produced, plaintiff may still prevail if she demonstrates that the articulated reason was a mere pretext for discrimination.

See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). See also *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1441 (10th Cir. 1996).

Defendant appears to concede that plaintiff has met the first element—that she engaged in protected activity. Defendant argues that plaintiff has failed to show any adverse employment action, however, because she merely contends that after her complaint to Hirsch in December 1998, co-workers treated her differently. This argument misreads the factual record. Plaintiff presented evidence that after her complaints to Hirsch, her supervisor yelled at her, called her a liar and disciplined her based on statements by Dezotell, whom she had accused of harassment. Plaintiff points to evidence that after her complaints, the harassment continued and Knox sent her a pigeon with a broken wing and told another employee that he would "kill the bitch" if defendant fired him. Further, when she left the foundry in late January, to plaintiff's knowledge no one had been punished for the harassing behavior.

The question, then, is whether these facts constitute an adverse employment action. In *Gunnell v. Utah Valley State College*, 152 F.3d 1253 (10th Cir.1998), the Tenth Circuit determined that an employer may be liable for retaliatory harassment by co-workers. Cf. *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992) (supervisors and co-workers actions toward plaintiffs such as not including them in conversations and meetings, laughing as they went by, and segregating and investigating plaintiffs created jury

could be found to provide defendant constructive or actual knowledge of the harassment.

question whether they had been constructively discharged).

Plaintiff does not appear to assert that the "write-up" by Curtis, standing alone, constituted adverse employment action. Rather she asserts that the write-up, defendant's knowledge that co-workers were harassing her, and management's failure to quickly respond to her complaints, combined to create an adverse employment action—a constructive discharge. Viewing the facts in a light most favorable to plaintiff, the Court finds that plaintiff has set forth facts to support a finding that defendant engaged in adverse employment action against plaintiff. Further, the causal connection between the protected activity and the adverse action here is inherent in the alleged retributive acts. Plaintiff has set forth a prima facie case of retaliation. Defendant has not articulated a legitimate, nondiscriminatory reason for the adverse action. Thus, the Court must deny defendant's motion for summary judgment on plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. # 61) filed December 8, 2000 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that plaintiff's Motion To Supplement The Record On Summary Judgment (Doc. # 66) filed January 31, 2001 be and hereby is **SUSTAINED.**