**Kelly FISCUS and Jeanie Steffen, Plaintiffs,**

**v.**

**The TRIUMPH GROUP OPERATIONS, INC., d/b/a Deluxe Specialty Manufacturing Company, Inc., Defendant.**

**No. CIV.A. 97–1031–MLB.**

United States District Court, D. Kansas.

Nov. 13, 1998.

Mark G. Ayesh, Allyson Yarbrough, Ayesh Law Offices, Wichita, KS, for Plaintiffs.

Robert D. Overman, Diane S. Worth, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court for consideration of defendant's motion for summary judgment. The court has reviewed all documents relevant to this matter including, but not limited to, defendant's motion for summary judgment and its supporting memorandum and exhibits (Docs.21–23), plaintiffs' response (Doc. 26), defendant's reply (Doc. 32), this court's pretrial conference order (Doc. 31), defendant's supplemental memorandum (Doc. 35), and plaintiff's supplemental memorandum (Doc. 34).[1]

---

1. The court granted the parties leave to file supplemental briefs in order to address the possible influence on this matter by two Supreme Court cases decided subsequent to the filing of their initial briefs: *Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v.. City of Boca Raton,* —— U.S. —— 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

## I. *NATURE OF CASE*

Plaintiffs Kelly Fiscus and Jeanie Steffen bring this action against Deluxe Specialty Manufacturing Company, Inc. ("Deluxe"). Fiscus and Steffen allege the following conduct by Deluxe: (1) quid pro quo sexual harassment; (2) hostile work environment sexual harassment; (3) retaliation; (4) negligent supervision, hiring, and training; (5) negligent infliction of emotional distress; and (6) intentional infliction of emotional distress (Doc. 31 at 2–4). The court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a) and now considers Deluxe's summary judgment motion on all claims.

## II. *STANDARDS OF REVIEW*

The usual and primary purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citations omitted).

The moving party must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law. *Id.* at 670. The nature of the showing depends upon whether the movant bears the burden of proof at trial with the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar materials *negating* the opponent's" claims or defenses. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (emphasis in original). Rather, the movant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's claim. *Adler*, 144 F.3d at 671 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense. *E.g.*, *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc).

Once the moving party properly supports its motion, the burden shifts to the nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir.1994). A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988), *aff'd* 939 F.2d 910 (10th Cir. 1991). Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Certain rules govern the presentation of facts and evidence. Local Rule 56.1 requires the movant to set forth a concise statement of material facts. D. Kan. Rule 56.1 (1998). Each fact must appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which the movant relies. *Id.* An opposing memorandum must contain a similar statement of facts. The opponent must number each fact in dispute, refer with particularity to those portions of the record upon which it relies, and if applicable, state the number of the movant's fact which is in dispute. The court may, *but is not obligated to*, search for and consider evidence in the record that would rebut the movant's evi-

dence, but that the opponent has failed to cite. *Adler,* F.3d at 672. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment *unless specifically controverted* by the statement of the opposing party. *See Gullickson v. Southwest Airlines Pilots' Ass'n,* 87 F.3d 1176, 1183 (10th Cir. 1996) (applying local rules of District of Utah). A standing order of this judge also precludes drawing inferences or making arguments within the statement of facts.

The parties need not present evidence "in a form that would be admissible at trial, but the content or substance of the evidence must be admissible. For example, hearsay testimony that would be inadmissible at trial may not be included . . . ." *Thomas v. Int'l Bus. Machines,* 48 F.3d 478, 485 (10th Cir. 1995) (internal quotations and citations omitted). Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. *Cole v. Ruidoso Mun. Schs.,* 43 F.3d 1373, 1382 (10th Cir. 1994) (regarding conclusory statements); *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir.1995) (requiring personal knowledge). Last, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e). Fed.R.Civ.P. 56(e); D. Kan. Rule 56.1; 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2722 (2d ed.1983) (footnotes omitted).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Ac-

cordingly, the court must review the "factual record and reasonable inferences therefrom in the light most favorable to the nonmoving/opposing party." *Kidd v. Taos Ski Valley, Inc.,* 88 F.3d 848, 851 (10th Cir.1996); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514. If sufficient evidence exists on which a trier of fact could reasonably find for the nonmoving party, summary judgment is inappropriate. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (1991).

### III. *FACTS* [2]

#### A. *Parties and Background*

Deluxe, wholly owned by the Triumph Group, is a Kansas Corporation located in Hutchinson, Kansas. Deluxe employs approximately 125 people in the manufacture of hydraulic oil reservoirs and fuel tanks (Doc. 22 at 2).

Deluxe hired Fiscus in October 1993, employing her until her resignation in April 1996 (Doc. 22 at 2; Doc. 26 at 3). At all times during her employment with Deluxe, she worked in the subassembly or fuel line area of the plant (Doc. 22 at 2).[3]

Deluxe hired Steffen in January 1995, and Steffen remains employed at Deluxe today (Doc. 22 at 2). She has worked primarily in the fuel line area, except for a brief span of time, between April 1997 and August 1997, when she worked in the packing or finishing area (Doc. 22 at 3).

At all times prior to February 1996, plaintiffs' immediate supervisor ("lead person") in subassembly was Melba Trotter. Trotter's supervisor was Robert ("Bob") Green, the first shift general foreman. Bill Colvin, vice president of manufacturing, supervised Green. In turn, Colvin reported to Dave Brummet, Deluxe's president (Doc. 22 at 3).

Both Fiscus and Steffen were aware of Deluxe's anti-sexual harassment policy contained in the company handbook and posted in the plant. Steffen believes she saw the

---

**2.** The court notes that the record does not include any deposition testimony of defendants. As far as the court can tell, plaintiffs did not conduct any "affirmative" discovery. Thus, the record almost exclusively represents only plaintiffs' version of the events.

**3.** The subassembly area where plaintiffs worked was open to the view of the entire plant. The noise level inside the plant was such that many employees, including Fiscus, usually wore hearing protection (Doc. 22 at 4; Doc. 26 at 4).

policy when she was first hired or shortly after that time. Fiscus, at the latest, became aware of the policy after making a complaint of sexual harassment against Green in December 1993. The policy provides, in part, the following:

> Any employee who believes that he or she has been the subject of sexual harassment must report the alleged conduct immediately to his or her department supervisor, department manager or human resource manager. If any employee feels uncomfortable reporting to these designated persons, or if the harassment continues despite previous reporting, he or she is to contact the company president. All complaints will be investigated in a timely and confidential manner. All persons involved in an investigation are required to maintain strict confidentiality about the matter. Any employee reporting sexual harassment or assisting in an investigation is ensured protection from coercion, intimidation, or retaliation.

(Doc. 22 at 3).

In May 1995, Rosemary Fisher was hired as the human resources manager. Prior to that time, Colvin had handled the duties of human resource management. In June 1996, Fisher held a full day seminar on sexual harassment for all management and first-line supervisors at Deluxe (Doc. 22 at 3–4).[4]

### B. *Allegations against Green*

According to Fiscus, she and two male coworkers were reprimanded by Green in December 1993, shortly after she was hired. The reprimand occurred over an incident where Fiscus wore a Santa hat to work, and one of her coworkers knocked it off, causing Fiscus to threaten to kick the coworker's "ass." When Green took Fiscus into his office, he warned her to be careful about the language she used around the men. Green then began asking Fiscus personal questions such as if she had a good marriage or a bad marriage and how her family life was. Green also told Fiscus that he found her very attractive (Doc. 22 at 4; Doc. 23, Fiscus Dep. at 112).

Fiscus reported this conversation to Colvin. Although her memory is unclear, she also may have reported some other "complaints" about Green to Colvin at this time, such as Green having asked her to go fishing with him and an alleged incident in a bar after work where Green pulled her into his lap.[5] Regardless, Colvin promptly reprimanded Green for his conduct and warned him to treat Fiscus with respect. Fiscus became aware that Green had been reprimanded because Green became angry with her for reporting him to Colvin (Doc. 22 at 4). Green even threatened Fiscus with her job if she reported him again (Doc. 22 at 4–5). Fiscus then went to Colvin again, who reassured her that her job was not in jeopardy. Colvin again warned Green to be civil to Fiscus and to treat her like every other employee (Doc. 22 at 5). After Colvin spoke with Green, Green's apparent harassment of Fiscus went on hiatus for six to eight months, but returned anew after that (Fiscus Dep. at 126–27). According to Fiscus, Green did become "nicer" over time (Fiscus Dep. at 135). Fiscus made no further complaints to

---

**4.** The court admits to some level of confusion about which positions and individuals in the Deluxe family constitute "management." On this subject, Deluxe only offers a portion of the sexual harassment policy, provided *supra*, which references "department supervisor, department manager or human resource manager" and the company president as individuals to be contacted with a complaint. Obviously, Fisher, Colvin, and Brummet qualify as "management" for the purposes of reporting sexual harassment. On the other hand, Green, as a "general foreman" and Trotter, as a "supervisor," specifically "lead person," are more difficult to label. It is not at all clear to the court whether Green and/or Trotter should be considered a "department supervisor" or "department manager." Deluxe states that a "lead person" (Trotter) is not company management and is not listed in the company's policy as one of the persons to whom sexual harassment complaints should be taken. The court does not readily agree. Perhaps this is simply a matter of loose language, however with so many individuals in the present matter who sport management-like titles and nothing more to identify "management" than a portion of the sexual harassment policy, the court cannot concur perfunctorily with Deluxe's statement that Trotter is not appropriately labeled management by plaintiffs.

**5.** Fiscus believes Colvin brought up the incident in the bar during their conversation. Also, according to Fiscus, Green previously had reported incorrectly to Colvin that Fiscus had sat in his lap (Doc. 22 at 4).

Colvin about Green until 1996 (Fiscus Dep. at 187).[6]

Yet, Fiscus did complain about Green to Trotter during this interim period. At Trotter's urging, both Fiscus and Steffen, went as far as to plan to tape record Colvin and Green in 1995 (Fiscus Dep. at 64; Steffen Dep. at 29–31). The women did not follow through with the plan, however, because the tape recorder could not be concealed adequately on Fiscus (Steffen Dep. at 30).

Fiscus claims that prior to January 1996, Green exhibited behavior which she considered sexual harassment (Doc. 22 at 5; Doc. 26 at 5). The behavior included, but supposedly was not limited to, the following actions: one, Green made inappropriate comments or innuendos, which included using the expression "screwing" as a double-entendre; two, Green asked her to go fishing several times; and three, Green once asked Fiscus to share a pizza (Doc. 22 at 5; Doc. 26 at 5; Fiscus Dep. at 64). Purportedly, Green's comments were a daily occurrence (Fiscus Dep. at 127). On one occasion, Fiscus even advised Trotter that she was going to tell Trotter every time Green made a comment to her. She then supposedly spent half of her day running over to Trotter to tell her about a comment (Fiscus Dep. at 64).[7]

Fiscus also makes sexual harassment allegations about workers at the plant generally and regarding Green's behavior toward Steffen. Fiscus states that others around the plant would refer to Steffen as "fresh meat" or being on Green's "hit list" (Fiscus Dep. at 83–84). Additionally, Fiscus comments that Green, in one instance, became "furious" when he saw Steffen talking with a male coworker (Fiscus Dep. at 90).

As for Steffen, she alleges that Green sexually harassed her by standing too close to her when he checked her work, touching her hand when he took a part from her, and "hanging around" her work area too much (Doc. 22 at 5; Doc. 26 at 6). Steffen further states that Green "would stand too close," such that his elbow could touch her

chest. She describes his behavior as "very uncomfortable" (Steffen Dep. at 124). Fiscus witnessed this "touching" behavior from Green toward Steffen (Fiscus Dep. at 89). Both Fiscus and Steffen cannot specify exactly how often Green's touching behavior occurred, however Fiscus states that it occurred "lots of times" and that "it's just how Bob [Green] did it" (Fiscus Dep. at 89). Steffen did not tell Green that his conduct made her uncomfortable and she did not report any of this behavior at the time it happened to Colvin or anyone else in management (Doc. 22 at 5; Doc. 26 at 6). Steffen claims that she did not report her "uncomfortableness" with Green's behavior because she was afraid (Steffen Dep. at 129).

Shortly after Steffen began working at Deluxe, she burned her finger (Doc. 22 at 5). Green, who handled first aid at the time, commented that Steffen would not like the way the cream looked. After prompting by Steffen, Green responded that the cream looked like "sperm" (Steffen Dep. at 206–07). Steffen told Trotter and Fiscus what Green said to her. Green's comment "floored" Fiscus when Steffen told her, and Fiscus commented to Steffen that she should tell Fisher, the human resource manager at the time, or write down the incident (Fiscus Dep. at 86). Apparently, Steffen never did tell Fisher or other management (Doc. 22 at 5–6; Doc. 26 at 7).

On another occasion, Steffen claims that she went into Green's office where Green and a coworker, Mike Miller, were present, and Green asked her if she wanted to order some "virgin vinyl" out of a catalogue (Steffen Dep. at 193). When Steffen asked him what that meant, he replied that it is a "dildo." Steffen then went back to her work area and asked Fiscus and Trotter if they knew what "virgin vinyl" was and relayed the incident to them (Doc. 22 at 6; Doc. 26 at 7; Steffen Dep. at 194).

In late January 1996, plaintiffs claim that Green came to Fiscus and asked her to

---

**6.** At the time of Fiscus' complaint, someone at Deluxe reminded her about the harassment policy. Fiscus then went and checked out the policy at that time (Fiscus Dep. at 37).

**7.** The court notes, however, that Fiscus purportedly had no trouble standing up to Green and apparently had little problem defending herself with supervisors generally (Doc. 22 at 7; Doc. 26 at 7–8; Steffen Dep. at 141–46).

scratch his back because he had a dry skin condition that made him itch. She complied. The next morning, right after Fiscus had clocked in, Green asked her to meet him in Colvin's office to put lotion on his back. Again, she complied, taking Steffen with her (Doc. 22 at 7).[8] Steffen said that Fiscus told her the following: "Bob [Green] wants lotion on his back, you're coming with me, that way there's no shit talk" (Steffen Dep. at 177). When the two of them arrived at Colvin's office, Green was sitting at Colvin's desk with his shirt off. He indicated to the two women to shut the door and asked Fiscus why Steffen was there. Fiscus responded, "[T]o cover our [sic] ass" (Doc. 22 at 7). Steffen later testified to the following:

> And Kelly [Fiscus] was putting lotion on him and I was getting real uncomfortable. I almost felt like I was having to watch a porno flick or something, I mean that's how I felt. And they weren't getting their little lotion job done fast enough, and I told Kelly [Fiscus], "Give me that damn lotion," and I squirted it on him and I rubbed it on real [sic] fast, and I said, "Let's get out of here, I don't like this."
>
> . . . .
>
> [Trotter] knew where we was [sic], and when we came out, she just kind of looked at us funny, and we explained again what we did. Then everybody kind of, I guess, forgot about it.

(Doc. 22 at 7; Steffen Dep. at 180–82). Fiscus agrees with Steffen's account of this incident (Doc. 22 at 7).

That same morning, following the lotion incident, Green started "hanging around" Fiscus and Steffen as they worked. He asked them not to report the incident to Colvin "because he [Green] had already been in trouble for this before and it could be his job" (Doc. 22 at 7). Later in the day, Green asked Fiscus to work in the tool room. Fiscus knew that she would be alone in the room, and because she feared Green would

come in while she was working, she went to Trotter and then Colvin to talk. Colvin instructed her to work in the tool room as instructed, but to leave the door open. During this time, Fiscus was crying and upset because she did not want to work in the room. Green did come in the tool room, at which time he told Fiscus about his fear of Colvin or anyone else finding out about the lotion incident (Doc. 22 at 8; Doc. 26 at 8–9; Fiscus Dep. at 175–80).

That same day, Trotter reported the incident to Colvin. Colvin later spoke with Fiscus about what happened (Doc. 22 at 8; Doc. 26 at 8). Fiscus advised Colvin that she did not want to formally complain about the incident because her experience taught her that Green would get upset and retaliate. She wanted Trotter and Colvin to handle the matter through appropriate channels. Colvin told Fiscus that he would "keep an eye on" Green (Fiscus Dep. at 186). The day after the lotion incident, Colvin asked Fiscus if she had any "extracurricular activities" to do that morning such as putting lotion on Green's back (Fiscus Dep. at 183).

A few days later, Trotter did not think that Colvin was doing enough about the lotion incident, so Trotter called Fisher and told her that Fiscus and Steffen needed to talk to her (Doc. 22 at 8–9). Trotter then told Fiscus and Steffen to talk to Fisher (Doc. 22 at 9). Fiscus and Steffen then reported the lotion incident to Fisher.[9] At that time, they also told Fisher about Green's prior, objectionable conduct (Doc. 22 at 9).[10]

Fisher immediately conducted an investigation of the incident. Green admitted to the incident when Fisher interviewed him. Pursuant to her recommendation, Deluxe suspended Green and then demoted him. Following Green's demotion, he resigned (Doc. 22 at 9; Doc. 26 at 9–10).

After Fisher's investigation, Deluxe held a plant-wide assembly in which Colvin reported that Green had been demoted due to sexual

---

**8.** Apparently, she complied this second time because she was "floored" by the demand (Doc. 22 at 7).

**9.** Colvin apparently was angered that Fiscus spoke to Fisher rather than him. Supposedly, he too wished to handle matters more informally with Green (Fiscus Dep. at 225–26).

**10.** Fiscus admits that although she previously had been to Fisher about a personnel matter and found her to be responsive, she did not go to Fisher before putting lotion on Green's back or immediately after the incident (Doc. 22 at 8; Doc. 26 at 8).

harassment and such conduct would not be tolerated by the company (Doc. 22 at 9). Both Fiscus and Steffen expressed satisfaction with how Fisher handled the complaint concerning Green (Doc. 22 at 9). In general, Fiscus and Steffen found Fisher to be open to their concerns and responsive to their complaints (Steffen Dep. at 104–07; Fiscus Dep. at 124–25).

Steffen admits that prior to the "lotion incident," everyone at Deluxe was "like a family" and that she had a very close relationship with Trotter, even to the point of calling her "Ma" (Doc. 22 at 6; Doc. 26 at 7).

### C. Allegations against Colvin

Steffen recites one incident of sexual harassment by Colvin. In order to get permission to wear a tank top at work, Steffen apparently once had to show Colvin that the tank top was "okay" by facing Colvin and bending over toward him (Steffen Dep. at 121–25). Steffen laughed about the experience afterwards, but still considered it humiliating and embarrassing (Steffen Dep. at 123).

Fiscus also claims that Colvin sexually harassed her. Specifically, Fiscus claims that the following specific events occurred during the summer or 1994 or, perhaps, 1995:

1. During a summer Saturday when she was working overtime beside Colvin, he put ice down the front of her shirt. She said nothing to him about this, did not report it to anyone, and Fiscus and Colvin continued to work alongside each other the rest of the day. Colvin never did anything like that again (Doc. 22 at 10; Doc. 26 at 11).

2. On another occasion during the same summer, Colvin asked Fiscus to work overtime to clean out a refrigerator on a Saturday when the electricity would be off in the plant, meaning that they would be working in the dark. She may or may not have complied (Doc. 22 at 10; Doc. 26 at 11).

3. Also during the same summer, Fiscus wanted to wear a tank top, and was told by Green that she would need to get approval to wear it from Colvin. Fiscus alleges that she showed her tank top to Colvin, and he made her bend over two times and then okayed its wearing. At this time, which was after she had made a sexual harassment complaint about Green to Colvin, she did not review the company's anti-harassment policy (Doc. 22 at 10; Doc. 26 at 11; Doc. 26, Ex. D at 00123).

Fiscus also claims that Colvin stood close to her and brushed up against her on several occasions (Fiscus Dep. at 212).

### D. Allegations of Retaliation

After the lotion incident, Steffen felt "caught in the middle" between her loyalty to Deluxe and her friendship with Fiscus (Doc. 22 at 11). Steffen believes that she was retaliated against because of her friendship with Fiscus and her decision to participate in Fiscus' lawsuit (Doc. 22 at 11; Doc. 26 at 11). Specifically, Steffen alleges that Trotter grew cold to her when they previously had been close. Trotter apparently treated Steffen differently than she had in the past, asking Steffen to stop calling her "Ma" (Doc. 22 at 11; Doc. 26 at 11). Steffen also points out that Colvin failed to change Trotter's behavior even though Steffen frequently complained to him about it. Steffen even expressed to Colvin a desire to transfer from Trotter's area, but was told that she would have to take a cut in pay (Steffen Dep. at 53–54). Last, Steffen believes the retaliation took the form of a change of assignment from the subassembly area to the finishing area or packing area, a transfer she considers a demotion (Doc. 22 at 11; Steffen Dep. at 149, 155).[11] Steffen states that she found Colvin to have an "open-door" policy, but she did not believe he always listened or cared (Doc. 22 at 11; Steffen Dep. at 49). Ultimately, Steffen went to Brummett about Trotter. Brummett said that he could not control the things people say, but he would "look into it" (Steffen Dep. at 153–54).[12]

11. Colvin states that Steffen was moved to the finish area to accomodate personality conflicts in the subassembly area. Steffen was moved, according to Colvin, because she had previously requested a transfer. He further indicates that Steffen's job title and pay rate were not affected by the change and she since has been moved back to the subassembly department (Colvin Aff., ¶ 7).

12. Interestingly enough, in Steffen's April 1996 performance appraisal (contemporaneous to the

Fiscus also claims that the retaliation she suffered consisted of Trotter being cold to her after the lotion incident. Fiscus claims that this was why she left Deluxe in April 1996 (Doc. 22 at 12).

Both Fiscus and Steffen took pride in their work and felt they were able to do their jobs well at Deluxe (Doc. 22 at 11). Other than Steffen's change of assignment discussed above, neither Steffen nor Fiscus was ever demoted or terminated (Doc. 22 at 11; Doc. 26 at 12). Neither received a cut in pay (Doc. 22 at 11; Doc. 26 at 11). In fact, both always received pay raises when due (Doc. 22 at 11; Doc. 26 at 11–12).

When Fiscus left Deluxe, she moved with her husband and family to Amarillo, Texas. Her husband had been transferred. Fiscus had accompanied him during the months prior to the move on several trips to Amarillo to look for a place to live. On her resignation notice, Fiscus indicated that the reason for leaving was "to relocate with husband" (Doc. 22 at 12; Doc. 26 at 13). Fiscus now contends, however, that she considered staying at Deluxe instead of moving to Texas. She recently stated that "I'm a very independent person and I had a good position at Deluxe and I didn't know if I wanted to give it up" (Fiscus Dep. at 25).

### E. Allegations of Emotional Distress

Fiscus claims that after the lotion incident she suffered migraines and hives. She never saw a doctor for these ailments (Doc. 22 at 12).

Steffen claims that she suffered from hives and depression as a result of the retaliation by Trotter (Doc. 22 at 12; Doc. 26 at 13). She also purportedly suffered from an upset stomach (Doc. 26 at 13; Steffen Dep. at 229–30)

Neither Fiscus nor Steffen is seeking any lost wages. Both seek only damages for emotional distress and punitive damages (Doc. 22 at 13).

time she claimed to be suffering "retaliation" from Trotter), she wrote the following comment: "I really like working here, like what I do. Melba [Trotter] makes it a great department to work for" (Doc. 22 at 12; Doc. 26 at 13). In defense

### IV. DISCUSSION

Fiscus and Steffen each bring both Title VII claims and state law tort claims against Deluxe. The court takes each of plaintiffs' claims in turn.

### A. Title VII Sexual Harassment

Steffen and Fiscus make two Title VII sexual harassment claims: (1) Green's conduct constitutes "quid pro quo" sexual harassment; and (2) the work environment created by Green, Colvin, and fellow employees constitutes "hostile work environment" sexual harassment.

Initially, the court notes that the United States Supreme Court, in *Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), recently eliminated the substantive distinction between the judicially-created "quid pro quo" and "hostile work environment" labels for sexual harassment claims under Title VII. *Newton v. Cadwell Labs.,* 156 F.3d 880, 883 (8th Cir.1998); *Henderson v. Whirlpool Corp.,* 17 F.Supp.2d 1238, 1239 n. 2 (N.D.Okla.1998). More to the point, in *Ellerth* and *Faragher* the Supreme Court definitively "announced the appropriate standards to be applied in determining whether an employer may be held liable for a supervisor's sexually harassing conduct in violation of Title VII." *E.g., Reinhold v. Virginia,* 151 F.3d 172, 174 (4th Cir. 1998). *Reinhold* summarizes the relevant holdings nicely:

> First, when a supervisor's sexual harassment of an employee culminates in a "tangible employment action," such as discharge, demotion, or undesirable reassignment, the employer is liable for the harassment, regardless of whether the employer knew or should have known of the harassment and regardless of whether the employer took remedial steps to end the harassment after learning of it. The Court defined "tangible employment action" in *Ellerth* as "a significant change in employ-

of this apparent incongruity, Steffen suggests that sexual harassment complaints and retaliation are not appropriately discussed on performance appraisals (Doc. 26 at 13).

ment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Although a "tangible employment action" may not always involve economic harm, the Court stated in *Ellerth* that "[a] tangible employment action in most cases inflicts direct economic harm."

Second, where the employee does not suffer a tangible employment action, but rather suffers an actionable hostile environment based on sex, the employer is still vicariously liable for the hostile environment created by its supervisor....

. . . .

...In *Faragher*, the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so."

*Reinhold*, 151 F.3d at 174–75 (quoting extensively from *Ellerth*, —— U.S. at —— – ——, 118 S.Ct. at 2268–70, and *Faragher*, —— U.S. at —— – ——, —— – ——, 118 S.Ct. at 2283–84, 2292–93) (internal citations omitted).

■■■ As the Tenth Circuit emphasizes, after the *Ellerth* and *Faragher* decisions, "[f]or a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1264 (10th Cir.1998) (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334,

1341 (10th Cir.1998)). In order to determine whether conduct was sufficiently severe or pervasive enough to be actionable sexual harassment, a court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cadena v. The Pacesetter Corp.*, 18 F.Supp.2d 1220, 1226 (D.Kan.1998) (citing *Faragher*, —— U.S. at ——, 118 S.Ct. at 2283) (internal quotations omitted). In considering these factors, a court also must consider the context in which the conduct occurred. *Id.* (noting *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir.1997)).

■■■ Also, in *Ellerth*, the Supreme Court carved out an affirmative defense for employers in circumstances where an employee suffers no tangible employment action yet faces actionable hostile work environment harassment. In such a circumstance, the employer may avoid vicarious liability for the hostile environment created by its supervisor if it can prove, by a preponderance of the evidence, the following: "(1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm.'" *Reinhold*, 151 F.3d at 175 (quoting *Ellerth*, —— U.S. at ——, 118 S.Ct. at 2270).[13]

## 1. Alleged "tangible employment action"

■■■ In the present matter, only Fiscus suggests that a supervisor's sexual harassment resulted in a tangible employment action. She argues that constant harassment

---

**13.** In *Ellerth*, the Court stated that "proof that the employer had promulgated an anti-harassment policy with a complaint procedure was not necessary in every instance as a matter of law." *Reinhold*, 151 F.3d at 175. In *Faragher*, however,

the Court held the defendant employer's policy ineffective as a matter of law where: (a) the policy did not include any mechanism by which the employee could bypass the harassing supervisor when lodging a complaint; and

(b) the employer was the City of Boca Raton, Florida and "those responsible for city operations could not reasonably have thought that precautions against [sexually] hostile environments in any one of many departments in far-flung locations could be effective without communicating some formal policy against harassment."

*Id.* (quoting *Faragher*, —— U.S. at —— – ——, 118 S.Ct. at 2293–94).

from Green—who purportedly wanted a relationship with Fiscus—led to her departure from Deluxe. Although Deluxe did not terminate Fiscus, Fiscus contends that she was constructively terminated.

 To substantiate a Title VII claim of constructive discharge, a plaintiff "must produce evidence that the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Penry,* 155 F.3d 1257, 1264 (internal quotations omitted). Put another way, a plaintiff "must allege facts sufficient to demonstrate that an objectively reasonable person would have viewed her working conditions as intolerable." *Cadena,* 18 F.Supp.2d 1220, 1231. Accordingly, if an employee chooses to resign of her own free will, "even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Id.* (internal quotations omitted). The bottom line is that a plaintiff must present evidence that she had no other option than to quit. *Id.* (citing *Yearous v. Niobrara County Mem'l Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997)).

The record here clearly does not support a constructive discharge theory. Fiscus presents no evidence to suggest that her resignation from Deluxe was based on anything other than a personal choice to go to Texas, and by her own account, the decision to leave Deluxe was her own to make. In other words, *she* decided that staying at Deluxe was less desirable than relocating to Texas with her family.[14] The court thus finds Fiscus' constructive discharge allegation untenable.

### 2. Alleged "hostile work environment"

 For the most part, plaintiffs' Title VII complaints detail allegations that the conduct of Green, Colvin, and unnamed fellow employees constituted hostile work environment sexual harassment. After a careful and thorough reading of the record, the court finds plaintiffs' claims lacking. Frankly, it is what the court does not find that seals the fate of these hostile work environment claims. The court simply does not find consistent and severe harassment. Nothing in the record suggests conduct of a physically threatening nature, and the possible humiliating incidents were few and far between. Last, neither Fiscus nor Steffen weathered harassing behavior from others that *unreasonably* interfered with their work performance.[15] In conclusion, the workplace environment Fiscus and Steffen allege perhaps fosters occasional stereotypically sexist and boorish behavior, but the Deluxe workplace in the record clearly is not permeated with discriminatory intimidation, ridicule, and insult so severe or pervasive as to alter the conditions of plaintiffs' employment and create an abusive working environment. In this conclusion, no reasonable jury could disagree.

### 3. Deluxe's affirmative defense

 Assuming, for the sake of argument, that Fiscus and Steffen could present actionable hostile work environment claims, Deluxe argues that it can satisfy the affirmative defense provided by *Ellerth.* The court agrees. Deluxe obviously had a written anti-harassment policy in place, which directed Fiscus and Steffen to any number of company officials for the communication of a complaint. The company also condemned harassing behavior in a public forum and conducted anti-harassment workshops/training for its supervisors. Throughout the period of the purported harassment, when Fiscus and Steffen followed the stated procedure, Deluxe responded accordingly—the company investigated the problem and took action. As for other incidents of sexual harassment alleged by Fiscus and Steffen, plaintiffs admitted that they did not follow policy. Given Deluxe's responsive track record, it is evident that Fiscus and Steffen had a via-

---

14. By Fiscus' own admission, she contemplated leaving her family and staying with Deluxe. According to her sworn testimony, she stated the following: "I had a good position at Deluxe and I didn't know if I wanted to give it up." Without question, these are not the sentiments of an individual in an intolerable situation or an employee with no other options than to resign.

15. In only one instance does the record suggest that either plaintiff was impeded in her work: when Fiscus spent part of a day running to Trotter with complaints about Green's comments.

ble path to take to resolve any harassment issues. To decline to follow policy therefore constituted an unreasonable failure to take advantage of the preventive or corrective opportunities made available to them by Deluxe. It is clear to the court, as it would be clear to any reasonable jury, that Deluxe meets its burden by a preponderance of the evidence in its showing of a defense to plaintiffs' claims of supervisor harassment.

### B. *Title VII Retaliatory Discharge*

■ Fiscus and Steffen next make Title VII retaliatory discharge claims, stating that "[t]he retaliation in this case is manifest" (Doc. 26 at 28). By statute, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees" because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C.A. § 2000e–3(a) (1994). A retaliation claim is brought legitimately regardless of whether plaintiff enjoys success with the original discrimination claim or defendant's behavior even actually violates Title VII. *Fortner v. Kansas,* 934 F.Supp. 1252, 1266 (D.Kan.1996) (citing *Archuleta v. Colorado Dep't of Insts.,* 936 F.2d 483, 487 (10th Cir.1991) and *Dey v. Colt Const. & Dev. Co.,* 28 F.3d 1446, 1457 (7th Cir.1994)), *aff'd* by *Fortner v. Rueger,* 122 F.3d 40 (10th Cir.1997). Plaintiff only needs "a reasonable good faith belief that the employer discriminated." *Id.* (noting *Dey,* 28 F.3d at 1457). In the present matter, plaintiffs' sexual harassment allegations clearly are employee actions under section 2000e–3(a), and, in spite of plaintiffs' lack of success with their underlying Title VII harassment claims, their Title VII retaliation claims can stand on their own.

■ To establish a prima facie case of retaliation under Title VII, a plaintiff must show the following: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1324 (10th Cir. 1997). Deluxe concedes, for the purposes of the present motion, that Fiscus and Steffen

satisfy the first element, however Deluxe argues that plaintiffs cannot carry their respective burdens for the second and third elements. Particularly, Deluxe contends that plaintiffs' prima facie cases fall short because neither plaintiff can point to an adverse action taken by Deluxe and thus satisfy the second element.

■ Some employer actions, such as a dismissal or demotion of an employee, virtually reek of retaliation when conducted on the heels of protected employee behavior. Other actions, however, are not so heavy-handed and thus are more difficult to deem "adverse." In broad terms, adverse employment actions are those that "have a demonstrable adverse impact on future employment opportunities or performances ... [such] that the alleged retaliatory act affected the terms and conditions of employment." *Fortner,* 934 F.Supp. at 1266–67. Specific examples of adverse actions include the following: demotions, adverse or unjustified evaluations and reports, transfer or reassignment of duties, failure to promote, and/or unfavorable letters of reference to prospective employers. *See id.* at 1266 (citing a litany of cases).

■ Although courts do "generally give a liberal definition to 'adverse employment action,' " *id.* (noting *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996)), an employer's behavior does not constitute "adverse employment action just because the employee dislikes it or disagrees with it." *Id.* at 1267. Judge Crow, in *Fortner,* grocery-listed several examples of employer's words or decisions that "did not amount to an adverse employment action":

supervisors gave [ ] plaintiff a performance review that was lower than previous reviews but still within the range of satisfactory; ...; fellow employees treated plaintiff "almost contemptuously" and subjected her to "isolation treatment," and [ ] plaintiff's work performance was publicly criticized; a nonthreatening reprimand letter was placed in [ ] plaintiff's personnel file but later removed; employer took various actions that did not adversely impact [ ] plaintiff's job performance or standing; [ ] plaintiff was issued a formal warning that was eventually removed from the person-

nel file; [ ] plaintiff received an adverse evaluation and letter of reprimand that were later rescinded.

*Id.* (internal citations omitted). The above examples illustrate that employers often make intermediary decisions that do not effect employment conditions protected by Title VII. *Id.* (noting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981)).

█ In the present matter, the record indicates that the following "adverse actions" supposedly happened to Steffen: (1) Trotter grew "cold" to Steffen, treating her differently or less friendly than she had in the past; (2) Colvin failed to respond to Trotter's different treatment of Steffen; (3) Steffen was informed that a transfer from Trotter's area would result in a cut in pay; and (4) Steffen was transferred from the subassembly area to the finishing area. Based on the case law examples outlined above, the court concludes that Steffen did not suffer any adverse action by Deluxe either after or contemporaneous with Steffen's complaints of harassment. She did not suffer any impact on her future employment opportunities, nor did she have the terms and conditions of her employment affected by the actions of Trotter, Colvin, or the others. Frankly, Steffen never took a pay cut or a demotion,[16] and, in the end, Steffen's proposed "adverse actions" simply do not rise to a level that provokes Title VII retaliation concerns.

█ The court reaches the same conclusion for Fiscus' claim. The record shows that Fiscus believes Trotter also became "cold" to her, Green threatened her job, and that she apparently left Deluxe because of the ongoing harassment.[17] The court finds these "adverse actions" lacking. For the

same reasons explained above with Steffen, the court concludes that Trotter's behavior does not equate to retaliatory action. Green's purported comments also fail to make the grade, having been refuted immediately by Colvin and having happened a few *years* before Fiscus left Deluxe. As for Fiscus' attempt to fashion a constructive discharge from her resignation from Deluxe, the court finds the allegation almost laughable. All evidence points to Fiscus leaving Deluxe of her own free will to join her family for greener pastures in Texas.[18]

In sum, neither Steffen nor Fiscus can provide an actionable adverse action with which to make their respective Title VII retaliation claims. The court thus concludes that neither plaintiff can make a prima facie showing for a retaliation claim, and no reasonable jury would determine differently. Plaintiffs' Title VII retaliation claims fail.

**C.** *Negligent Supervision, Hiring,* *and Training Claim*

█ Fiscus and Steffen next argue that Deluxe negligently trained and supervised "in the area of sexual harassment" (Doc. 26 at 29). They suggest that their "regular and continuous complaints," were "treated cavalierly and ignored by management." This behavior, Fiscus and Steffen argue, is evidence of Deluxe's negligence. Additionally, they argue, "management witnessed some of the inappropriate conduct, but did not intervene or address the situation" (Doc. 26 at 29).

It is clear that Kansas courts do not accept a theory of liability for negligent supervision when the underlying behavior is an employee's sexual harassment of plaintiff. *E.g., Oliphant v. Perkins Restaurants Operating Co.*, 885 F.Supp. 1486, 1495 (D.Kan.1995) (high-

---

**16.** Steffen's self-labeled "demotion" to the finish area from the subassembly area appears to be little than an attempt by Colvin to accomplish what Steffen originally requested, a move away from Trotter. Her job title remained the same as did her pay rate.

**17.** The court generously assumes that Fiscus is trying to present some form of a constructive discharge argument here. She does not articulate this claim in the retaliatory discharge context, but does reference the theory earlier in her brief when discussing her allegation of quid pro quo harassment.

**18.** Even assuming, for the sake of argument, that Fiscus would have stayed at Deluxe while her family relocated to Texas, she has failed to show how her resignation was the result of illegal discriminatory conduct. *See Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir.1994) (stating that "not every unhappy employee has an actionable claim of constructive discharge pursuant to Title VII"), *cert. denied*, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).

lighting *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 504 (D.Kan.1994), and *Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187, 1197–98 (D.Kan.1995), which both expressed serious doubt that Kansas would recognize a cause of action holding an employer liable for negligent supervision where the underlying wrongful conduct is sexual harassment by an employee). As the Tenth Circuit explained, this cause of action, if recognized, "would necessarily arise any time a middle level supervisor engaged in discriminatory conduct. We think it unlikely that the Kansas courts would adopt a liability rule with such broad implications." *Polson v. Davis,* 895 F.2d 705, 710 (10th Cir.1990).

Fiscus and Steffen argue, however, "negligent supervision and training has been recognized in the context of sexual harassment" and that the rejection of such a cause of action "is limited to factual scenarios wherein employees were held to be employees at will" (Doc. 26 at 29). Plaintiffs do not follow up on the employment-at-will distinction other than to state obliquely that "[t]his is clearly not the situation in plaintiffs' case" (Doc. 26 at 29). In sum, Fiscus and Steffen suggest the following: (1) the present matter can be distinguished factually from the line of cases rejecting a negligent supervision cause of action in the sexual harassment context because the present claim was not presented in order to "circumvent" the employment-at-will doctrine (presumably because Fiscus was not and Steffen is not an employee at will); and (2) legal support for this claim can be found in *Laughinghouse v. Risser,* 754 F.Supp. 836 (D.Kan.1990). The court disagrees.

Plaintiffs' first argument is an overly creative reach at best. Kansas courts unquestionably favor a traditional notion of the employment-at-will doctrine and will not conjure a different relationship absent "an express or implied contract between an employee and his employer covering the duration of such employment." *Morriss v. Coleman, Inc.,* 241 Kan. 501, 510, 738 P.2d 841 (1987) (noting

*Swart v. Huston,* 154 Kan. 182, 117 P.2d 576 (1941)). Neither Fiscus nor Steffen presented any evidence of any such contract or, frankly, anything at all to suggest an employer-employee relationship with Deluxe other than that of employment-at-will. A mere passing comment that the employment-at-will doctrine does not apply to plaintiffs does not suffice. Therefore, regardless of the legitimacy of plaintiffs' theory about the potential for a negligent supervision claim when an individual is not an employee at will, the court does not accept plaintiffs' attempt to distinguish the aforementioned cases from application to this matter based on any form of an employment-at-will doctrine argument.

As for plaintiffs' reliance on *Laughinghouse,* the court does not find this argument persuasive either. The *Laughinghouse* Court squarely addressed the tort of outrage in the context of sexual harassment, but did not extend its holding to negligent supervision and hiring. Plaintiffs attempt, however, to link the *Laughinghouse* conclusions with other Kansas cases that apparently recognize a claim of negligent retention where negligent employees present an "undue risk of harm." *E.g., Bernard v. Doskocil Cos., Inc.,* 861 F.Supp. 1006 (D.Kan.1994). This court cannot take a leap of faith across the chasm that separates outrage from negligent supervision and hiring. Clearly, Kansas does not recognize a cause of action for negligent supervision, hiring, and training in the context of sexual harassment. Plaintiffs' attempt to work around this rule does not persuade the court otherwise. The court thus concludes as a matter of law that plaintiffs' claims for negligent supervision, hiring, and training cannot be sustained.

### D. *Negligent/Intentional Infliction of Emotional Distress*

Last, Fiscus and Steffen bring claims of negligent infliction of emotional distress [19] and intentional infliction of emotional distress or outrage.

**19.** Although plaintiffs' claim for negligent infliction of emotional distress is rather vague, the court does recognize, at the outset, the claim as legitimate and distinct from the intentional infliction of emotional distress claim. This court's pretrial conference order clearly states the following issue of law remaining to be determined

at trial: Have plaintiffs failed to state a valid claim of intentional or negligent infliction of emotional distress? (Doc. 31 at 4). Also, in the Plaintiffs' Contentions section of the order, plaintiffs allege that "[d]efendant negligently inflicted emotional stress upon the plaintiffs" (Doc. 31 at 7).

### 1. Intentional Infliction of Emotional Distress or Outrage

The Tenth Circuit has clearly stated the appropriate standards by which to evaluate a claim of intentional infliction of emotional distress or outrage:

> To succeed on a claim of outrage, as a threshold matter, the employee must show that: (1) defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) the emotional distress suffered by [ ] plaintiff is so extreme the law must intervene because no reasonable person would be expected to endure it. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society.

*Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1176 (10th Cir.1996) (internal citations and quotations omitted), *rev'd on other grounds*, 149 F.3d 1191 (1998). Kansas courts maintain these decidedly difficult threshold hurdles for this tort so that worthy claims may be separated from "those based on trivialities or hyperbole." *Rupp v. Purolator Courier Corp.*, 790 F.Supp. 1069, 1073 (D.Kan.1992) (noting *Fletcher v. Wesley Med. Ctr.*, 585 F.Supp. 1260, 1261–62 (D.Kan. 1984)), *aff'd as modified by* 45 F.3d 440 (10th Cir.1994) (table decision). As such, liability "does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language[,] and to occasional acts and words that are definitely inconsiderate and unkind." *Anspach v. Tomkins Indus., Inc.*, 817 F.Supp. 1499, 1506 (1993) (citing *Taiwo*

*v. Vu*, 249 Kan. 585, 592, 822 P.2d 1024, 1029 (1991)) (internal quotations omitted).

As Fiscus and Steffen concede, Kansas courts have been reluctant to extend the outrage cause of action to claims of sexual harassment in the employment setting. *See, e.g., Laughinghouse*, 754 F.Supp. at 843 (citing several examples). Plaintiffs believe, however, that *Laughinghouse* and *Gomez v. Hug*, 7 Kan.App.2d 603, 645 P.2d 916 (1982),[20] provide support for an outrage claim in the present matter. Specifically, plaintiffs argue that these cases suggest that an outrage claim survives summary judgment when the evidence shows an employee subjected to constant, continual, and long-term abuse and harassment by her employer. In *Laughinghouse*, for example,

> [t]he harassment and abuse took the form of (1) screaming and cursing; (2) unwanted touchings and sexual comments; (3) fits of rage which included throwing things and tearing up files; (4) threats of loss of employment; and (5) inhibition of job performance through several tactics.

754 F.Supp. at 843. The *Laughinghouse* Court further emphasized the severity of the supervisor's conduct toward plaintiff by providing comments from fellow employees who witnessed the behavior. For example, one individual stated that the supervisor's conduct towards plaintiff was "a concerted effort to terrorize her and to intentionally break her spirit" and another said that the supervisor treated plaintiff "like an animal." *Id.* (internal quotations omitted). In *Gomez*, the court referenced a "terrifying" tirade by the employer, an exhibition of "vitriolic bullying." 7 Kan.App.2d at 610, 645 P.2d at 922.[21]

] In the present case, neither Fiscus nor Steffen faced the level or type of outra-

---

**20.** The court notes that the *Rupp* Court, in commenting about *Gomez*, also reiterated the reluctance of Kansas courts to extend the outrage cause to sexual harassment claims in the workplace. The court stated that "employment discrimination by itself, without the aggravating factors present in *Gomez*, would not amount to outrage." *Rupp*, 790 F.Supp. at 1073.

**21.** A few other cases also provide valuable illustrations of just how extreme behavior must be in order to allow an outrage claim to proceed: (1) In *Oliphant v. Perkins Restaurants Operating Co.*,

885 F.Supp. 1486, 1489–90 (D.Kan.1995), the supervisor repeatedly cursed at and threw objects at a female employee for over a year and even berated the employee at home with daily phone calls when she was home pregnant on medical leave; and (2) In *Miller v. Bircham, Inc.*, 874 F.Supp. 337, 341 (D.Kan.1995), a supervisor took no action when he knew an employee was subjected to a fellow employee's numerous offensive touchings, offensive and demeaning remarks, and instances where another employee exposed his penis to her while making lewd remarks.

geous behavior presented in *Laughinghouse* and *Gomez*. Only Green's alleged comments and incidents of physical proximity to Fiscus and Steffen occurred with any regularity. Other than that, Green apparently also frequently touched plaintiffs' hands inappropriately during the course of their work. Although plaintiffs apparently may have been disgusted or made uncomfortable by Green's purported behavior, these actions hardly can be compared to the conscience-jarring and systematic behavior of the supervisors in *Laughinghouse* and *Gomez*. Even if the court, for the sake of argument, aggregates Green's and Colvin's alleged comments and actions and considers the behavior to be somewhat constant and continuous in nature, it amounts to little more than the rather embarrassing and somewhat sexist behavior of grown men acting like adolescents. This purported behavior simply does not rise to a level beyond that of insults, indignities, and annoyances. The court thus concludes that the supervisors' conduct cannot reasonably be regarded as so extreme and outrageous that it goes beyond the bounds of decency and is utterly intolerable in a civilized society. No reasonable jury could conclude otherwise.

### 2. Negligent Infliction of Emotional Distress

 In Kansas, recovery for negligent infliction of emotional distress requires that the distress result in "physical impact" or an actual physical injury to plaintiff. *Anderson v. Scheffler*, 242 Kan. 857, 860, 752 P.2d 667, 669 (1988) (citing *Hoard v. Shawnee Mission Med. Ctr.*, 233 Kan. 267, 662 P.2d 1214 (1983)).[22] This actual physical injury "must occur contemporaneously with or shortly after the incident causing the emotional distress." *Freeman v. Kansas State Network, Inc.*, 719 F.Supp. 995, 1000 (D.Kan.1989) (noting *Hoard*, 233 Kan. at 275, 662 P.2d at 1220–21). Additionally, "[g]eneralized physical symptoms of emotional distress such as headaches and insomnia are insufficient to state a cause of action." *Anderson*, 242 Kan. at 860, 752 P.2d at 669 (citing *Hopkins v.*

---

**22.** The reason for the injury to be "severe" distress, evidenced by actual physical injury is that "[e]motional distress can be easily feigned or counterfeited" and "emotional distress is a com-

*State*, 237 Kan. 601, 612–13, 702 P.2d 311 (1985)); *see also Anspach*, 817 F.Supp. at 1520 (emphasizing the standard from *Anderson* and concluding that stress, troubled sleep, headaches, difficulty concentrating, and crying spells do not satisfy the requirements of physical injury).

 In the present matter, Fiscus claims to have suffered migraines and to have gotten hives after the lotion incident. Steffen also claims to have gotten hives, as well as suffered from depression as a result of Trotter's purported retaliation. She also suggests that she fell victim to an upset stomach. Based on the evidence in the record, the court concludes that plaintiffs' offered, generalized symptoms of emotional distress are insufficient to state a cause of action for negligent infliction of emotional distress. No jury could come to a contrary conclusion.

### V. CONCLUSION

For the reasons expressed above, the court GRANTS defendant Deluxe's motion for summary judgment on all claims. The matter is hereby dismissed with prejudice and all relief denied.

The court neither invites nor encourages a motion for reconsideration. Any motion for reconsideration must comply with Fed. R.Civ.P. 59 and 60, D. Kan. Rule 7.3, and the standards set out in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan.1992). The motion may not exceed five pages in length, including supporting arguments and authorities, regardless of the number of points raised. A response shall also be limited to five pages. No replies may be filed.

IT IS SO ORDERED.

---

mon experience of life and is usually trivial." *Freeman v. Kansas State Network, Inc.*, 719 F.Supp. 995, 1001 (D.Kan.1989).